IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| CECILIA D. BROWN,<br><br>    Plaintiff,<br>v.<br><br><br>JOHN SNOW,<br>    Secretary of the Treasury,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)   CIVIL CASE NO.: 3:03-CV-240<br>)   JUDGE PHILLIPS/SHIRLEY<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

An employee filed suit against her former employer pursuant to the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* for failure to accommodate her disability, as well as for retaliation when she asked for reasonable accommodation. Defendant filed its motion for summary judgment on both claims. Pursuant to plaintiff's response, it appears that the plaintiff has decided not to pursue her failure to accommodate claim. Rather, the plaintiff states that the only issue is whether the defendant retaliated against her. For the reasons that follow, defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

## LAW APPLICABLE TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted by the court only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party

1

to conclusively show that no genuine issue of material fact exists. The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.,* 105 F.3d 279, 280-81 (6thCir.1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6thCir.1987).

Once the moving party presents evidence sufficient to support a motion under Rule 56 of the Federal Rules of Civil Procedure, the nonmoving party is not entitled to a trial simply on the basis of allegations. The non-moving party is required to come forward with some significant probative evidence, which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex,* 477 U.S. at 323; *Collyer v. Darling,* 98 F.3d 220 (6thCir.1996).

## **BACKGROUND**

The facts of this case will, of course, be considered in the light most favorable to the plaintiff, Ms. Ceilia D. Brown ("Ms. Brown"). Ms. Brown began work as a Revenue Agent with the Internal Revenue Service ("IRS") in 1979. As an IRS agent, Ms. Brown's work necessitated collecting records and auditing those records. Her duties involved traveling to taxpayers' homes; working "different hours, after hours a lot;" sending correspondence related to tax matters; working from her flexi-place office at home; and coming into the IRS office at least once every ten days.

2

In November 2000, Ms. Brown filed Requests for Reasonable Accommodations under the Rehabilitation Act. Ms. Brown stated that she suffered from medical conditions, including fibromyalgia (a physical impairment) and bipolar disorder (a mental impairment). Her accommodation requests included a reduced workload, an ergonomic work chair, and the removal of a communal computer from her desk.

Ms. Brown states that when she raised the issue of reasonable accommodation with her Branch Chief Manager, Maggie Houston, Ms. Houston said words to the effect: "I don't know what reasonable accommodation is and I don't care what it is. I don't have time to fool with it." Thereafter, in mid-November, Ms. Brown stated that her direct supervisor, Howard Swarts, suggested that she should file for disability and suggested that she speak with Ms. Houston, about her situation. However, Ms. Brown indicated that she did not want to apply for disability. From her conversations with her managers, Ms. Brown understood that although she was only applying for accommodation, the IRS had decided to push her toward disability and "tried to make it sound like a good deal."

In late December 2000, Ms. Brown received a response to her Requests for Reasonable Accommodations, stating that she had been accommodated. Although the centralized computer had been moved, Ms. Brown states that she was not accommodated in that her workload was not less demanding nor was it physically lighter. Furthermore, she had not been provided with an ergonomic chair.

In regard to the ergonomic chair, Ms. Brown had shown Mr. Swarts an ergonomic

3

chair in the Collections Department, which was adjacent to her work space, and had requested the same model. The chair had an adjustable lumbar support. Ms. Brown was told and understood that the ergonomic chairs with adjustable lumbar support were only for the Collections Department, but that Mr. Swarts would be ordering such a chair for Ms. Brown's use.

In January 2001, Ms. Brown gave Mr. Swarts a Supervisor's Statement, which is a document used for evaluating applicants for disability retirement. Mr. Swarts completed the form, sent it to the appropriate office for disability retirement, and placed a copy of the completed Supervisor's Statement in Ms. Brown's mail box drop. Ms. Brown claims that Mr. Swarts filed this paperwork without her knowledge and without Ms. Brown's agreeing that Mr. Swarts could send in documentation on her behalf. In essence, Ms. Brown states that she was not ready to apply for disability at that time. She states that she only gave the form to Mr. Swarts to look it over and to tell her what he thought about it.[1]

Ms. Brown suffered a work-related injury on March 2, 2001, and was on leave without pay after her injury. In April of 2001, Ms. Brown applied for disability retirement asserting that she submitted her application due to all the stress from the IRS management's harassment.

On about April 6, 2001, Mr. Swarts called Ms. Brown and told her to return to work.

---

[1] Ms. Brown had taken disability forms to her physicians around the time that Ms. Swarts completed his form.

4

Ms. Brown reported back to work on April 9, 2001. During her absence, Ms. Brown's ergonomic chair had arrived at the IRS office. While at work, Ms. Brown approached Mr. Swarts to tell him that the chair was not ergonomic and that she needed a chair with adjustable lumbar support. Ms. Brown claims that Mr. Swarts only remarked that "it was a nice chair."[2] Later in the day, Mr. Swarts told Ms. Brown that the paperwork to allow her to return to work could not be processed and that it would take two weeks to return her to the rolls following her worker's compensation injury. He told her to go home and that she would not be paid for her day's work. While Mr. Swarts went home, Ms. Brown stayed at work until 6:00 p.m. to resolve issues regarding medical leave. On April 11, 2001, Mr. Swarts discovered he had erred in his understanding and that the IRS could return Plaintiff to work status or leave at her request. He told Ms. Brown she could return to work on April 15, 2001.

Thereafter, Ms. Brown asked her union representative, Ernest Joyner, to intervene to assist in obtaining accommodations and to assist with hostile conditions. In a meeting with Mr. Joyner, Mr. Swarts, and Mr. Swarts' clerk, the clerk stated that she knew the chair recently bought was not ergonomic, but that they had bought the chair because it was cheaper. On May 17, 2001, Mr. Joyner filed a grievance on Ms. Brown's behalf in an attempt to obtain the ergonomic chair for Ms. Brown. Three days later, the requested chair with adjustable lumbar support was provided from the Collections Department. Ms. Brown

---

[2] Defendant asserts that it was the union representative that indicated that " it was a nice chair." It is true that plaintiff's supporting affidavit of the union representative states that he remarked, "[i]t was a nice chair."

5

was advised that the chair was only on loan until it was needed by the Collections Department. Apparently, there had been unused ergonomic chairs in the Collections Division the entire time that Ms. Brown waited for the appropriate chair. Additionally, although Ms. Brown was told that only the Collections employees were allowed to use the ergonomic chairs, Ms. Houston's secretary, who had no reported need for a ergonomic chair, took one of the chairs for her own use.

Ms. Brown was permitted to return to work on May 21, 2001. Upon her arrival, Mr. Swarts placed her in a different department, the Taxpayer Service. Ms. Brown understood that this job would be light duty and that she would be providing only technical assistance. Therefore, she agreed to the transfer. However, the position required her to stand all day long. This activity was outside of Ms. Brown's medical restrictions and physically tasking on Ms. Brown's health. Ms. Brown claims that attempts to contact Mr. Swarts to advise him that the Taxpayer Service could not accommodate her were made, but the attempts were unsuccessful. Therefore, Ms. Brown contacted Mr. Joyner to intervene, again, and assist in the situation. Mr. Joyner spoke with Mr. Swarts and requested that Ms. Brown be given another position.

Mr. Swarts then assigned Ms. Brown to work claims "donated" from other claims agents. Ms. Brown asserts that the agents let go of their unmanageable and "lost cause" cases and that she essentially was given a large load of unproductive files that were difficult to work. Additionally, although Ms. Brown was told that she could handle these files by correspondence and/or telephone, Ms. Brown claims that it was clear that the claims could

6

not, in reality, be handled by correspondence and/or telephone. Essentially, all of the cases required travel to taxpayers' homes and offices. Therefore, Ms. Brown was still in the position of going into the field and carrying heavy files, computers, and other equipment. Thereafter, Ms. Brown suffered another work related injury. She strained her shoulder while loading her work materials, a computer, printer, and large files, on September 24, 2001. She filed a workers' compensation claim and went on leave.

On October 12, 2001, Ms. Brown's application for disability was denied. Ms. Brown stated that she called Howard Swarts, and he seemed "stunned." Ms. Brown states that Mr. Swarts said words to the effect that, "I guess I'm just going to have to load you down with cases, write you up on every little thing you do, and run you into the ground." He also allegedly told her, " we didn't have this conversation." He also allegedly said that he was going to make sure she didn't get good evaluations from anyone.[3]

At this point, Ms. Brown believed that Mr. Swarts' hostility and vindictiveness toward her was "out in the open" and she believed that Mr. Swarts was discriminating against her due to her disabilities, as well as harassing her in connection with her requests for accommodation. A few days later, Ms. Brown received a memorandum, dated October 18,

---

[3]While Mr. Swarts does not recall making the statements attributed to him, he states that if he made any such statement, it would have been out of exasperation and/or with a facetious tone such that Ms. Brown should have recognized it as such.

Further, on September 13, 2001, Mr. Swarts signed an evaluation of Ms. Brown, in which she met or exceeded all expectations. Ms. Brown's evaluation is absent of any comments that she was unable to perform the essential functions of her job.

7

2001, from Mr. Swarts stating a reminder that Ms. Brown was to work cases by limited scope and correspondence, i.e by mail and/or phone only. Ms. Brown asserts that she was never given this instruction. Ms. Brown asserts that Mr. Swarts was beginning "to paper" her file in efforts to terminate her employment and to show facial support/evidence of accommodating Ms. Brown.

Ms. Brown went to the office on October 19, 2001, to obtain information for filing a Statement of Discrimination with the Department of the Treasury. While at the office, Mr. Swarts asked Ms. Brown to speak with him. During the discussion, Ms. Brown and Mr. Swarts discussed Ms. Brown's disability and accommodation issues. Ms. Brown stated to Mr. Swarts that he need not complete poor evaluations of her work performance if he wanted to help her apply for disability retirement. Rather, he need only state that he apparently had not accommodated her disabilities, and as a result, she had missed work. According to Ms. Brown, Mr. Swarts stated that such statements regarding his failure to accommodate would indicate that he had been harassing Ms. Brown. Also, in the conversation, Ms. Brown stated that she was intending to file her Statement of Discrimination. Then, according to Ms. Brown, Mr. Swarts told her that he would be fired for such actions and that he had just heard a discussion of a manager who was fired after a female employee filed a complaint against him.

That day, Ms. Brown contacted Lalita Hodge, an IRS Counselor, to initiate the informal process for filing a complaint for ongoing and continuing failure to accommodate her disabilities and ongoing and continuing retaliation for having sought reasonable

8

accommodation for her disabilities under the Rehabilitation Act. Ms. Brown filed a Statement of Discrimination with the Department of the Treasury on November 16, 2001, which was supplemented on January 22, 2002. The Department issued its Finding of No Discrimination on January 27, 2003. Ms. Brown filed her complaint on January 31, 2003, which was within 90 days after she received the Finding of No Discrimination.

Ms. Brown claims that after she filed her Statement of Discrimination, the IRS put documents in her file indicating poor performance. Ms. Brown states that these documents were not shown to her and asserts that management was attempting to escape culpability for their actions.

In a November 14, 2001 meeting, Ms. Brown was accused of seeking double recovery for pay while she was on leave between March 5 and May 15 of 2001. Participants in the meeting were Bobbie Moore, a clerk, and Robin Britton, the Acting General Manager. Ms. Brown insisted she had not been paid for these days. About a week after the meeting, it was determined that Bobbie Moore had entered the wrong code, which had prevented Ms. Brown from being paid and resulted in the false allegations. Ms. Brown states that no apology for the purported "mistake" or for the accusation of fraud was communicated to her.

On November 15, 2001, Ms. Brown asked Robin Britton for a CA-2 and a CA-35 form for occupational disability so that she could take leave. Although Ms. Brown understood that Ms. Britton had access to these routine forms, Ms. Britton stated initially

9

that she did not know how to retrieve these documents. After a second request, Ms. Brown was given one of the forms on November 27, 2001. However, Ms. Brown states that she had to obtain the remaining forms on her own from the Office of Workers' Compensation Programs.

On November 24, 2001, Ms. Brown claims that she fell ill due to stress from work. She called her doctor, who prescribed medication for a panic attack. Ms. Brown states that she felt better on Saturday and decided to take her time sheets to the office. However, her entrance pass code to the door did not work. Eventually, a guard let Ms. Brown into the building using his code.

Ms. Brown went to her cubicle and turned on her computer terminal. However, shortly after, two security guards appeared and told her she was to be escorted from the building. The guards would not tell Ms. Brown why she was being barred access to the building. Ms. Brown asserts that she was upset and humiliated. Ms. Brown states that she called a co-worker on Sunday, November 25, 2001, and was advised that rumors had circulated at work, indicating that she had been terminated early in the week of November 19 and that she had been barred from the Building. In response, on Monday, November 26, 2001, Ms. Brown called Mr. Joyner, asking him to address the issue.

After speaking with Ms. Brown, Mr. Joyner approached Ms. Britton and Ms. Houston and inquired into whether Ms. Brown had been fired. Both managers denied that Ms. Brown had been fired. Upon further investigation, Mr. Joyner was advised by one of the

building managers that Ms. Brown had been barred from the building. Upon his inquiry to Ms. Houston as to why Ms. Brown had been barred, Ms. Houston stated that Ms. Brown was a dangerous person and that she was afraid that Ms. Brown would bring a gun into the building and shoot her.

A few weeks later, on November 30, 2001, Ms. Brown, with her attorney and with Mr. Joyner, attended a TIGA interview where she was interrogated by IRS investigators.[4] They confirmed that Ms. Brown had not been terminated. Although inquires were made as to why Ms. Brown was being interrogated, no reason or explanation was offered. Apparently, reports had been made that Ms. Brown had mentioned statements that she was going to "go out with a bang;" that none of the employees were fit to kill; etc. The investigators asked Ms. Brown questions regarding ownership of a gun; whether Ms. Brown was a marksman; and matters as to her husband being a policeman.

Mr. Joyner states that it was clear from his dealings with Ms. Brown that she was worn down and defeated by her efforts to get something as simple as an ergonomic chair to make her work life a little more comfortable. Further, he states that Ms. Brown had mentioned that she was going to quit or retire so she would not have to put up with the harassment any longer. He also reports that, shortly after Ms. Brown was escorted from the Building, Ms. Britton tearfully told him that she was aware of Ms. Brown serious medical condition and confessed that "we've done so many mean things to [Ms. Brown] lately."

---

[4] The TIGA is the internal Inspection Division of the IRS.

11

# MOTION FOR SUMMARY JUDGMENT AND APPLICABLE LAW

## Failure to Accommodate

Pursuant to Plaintiff's Response to Defendant's Motion for Summary Judgment, Ms. Brown forgoes her claim that the IRS failed to accommodate her disabilities and does not address or dispute defendant's arguments regarding same. Therefore, summary judgement as to plaintiff's failure to accommodate claim is appropriate.

## Retaliation Claims

Retaliation claims can occur in any number of situations. "The essence of such a claim is that the plaintiff engaged in conduct protected by the Constitution or by statute, the defendant took an adverse action against the plaintiff, and this adverse action was taken (at least in part) because of the protected conduct. There are variations on this theme in bodies of statutory law that allow retaliation claims (e.g. ADA, Title VII, NLRA, etc.), but the essential framework remains the same." *Thaddeus-X v. Blatter,* 175 F.3d. 378, 386-87 (6thCir.1999). To establish a *prima facie* case of retaliation, the plaintiff must prove: 1) she engaged in protected activity; 2) the exercise of protected rights was known to the defendant; 3) that the defendant then took an adverse employment action against plaintiff or plaintiff was subject to severe and pervasive retaliatory harassment; and 4) a casual connection existed between the protected activity and the adverse employment action or retaliatory harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792

12

(6thCir.2000).

The burden upon the plaintiff to establish a *prima facie* case of retaliation is minimal and easily met. *EEOC v. Avrey Dennison Corp.*, 104 F.3d 858, 861 (6thCir.1997) (citing *Wrenn v. Gould*, 808 F2d 493, 500 (6thCir.1987)). Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. *Morris,* 201 F.3d at 792-93. If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision. *Id.*

In claims involving federal employees, an employee must initiate contact with a[n EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action. 29 C.F.R. § 1614.105(a)(1). The defendant is claiming that any action of discrimination or retaliation on its part would be considered "discrete acts," subject to the 45 day reporting requirement. However, the plaintiff is asserting repeated harassment that constitutes a hostile work environment.

A hostile work environment claim is composed of a series of separate acts that collectively constitutes one unlawful employment practice. *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 2074 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)). A charge alleging a hostile work environment claim will not be time barred so long as all acts which constitute the claim are part of the same unlawful

13

employment practice and at least one act falls within the time period. *Id.* at 122 and 122 S.Ct. at 2077. Although many acts upon which the claim depends occurred outside the filing period, the court cannot say that they are not part of the same actionable hostile environment claim. *Id.* at 120-21 and 122 S.Ct. at 2076.

The Court finds that Ms. Brown has supported her claim of a hostile work environment sufficient to overcome summary judgment.[5] At least four instances of alleged retaliation occurred within the 45-day time period, and those instances were sufficiently connected to other instances of alleged retaliation outside of the 45-day time frame.

In regard to the first element of retaliation, the plaintiff's request for accommodations is a protected activity.[6] *42 U.S.C.A. § 12203(a); see also Walborn v. Erie County Care Facility*, 150 F.3d. 584, 589 (6thCir.1998). Furthermore, it is indisputable that the defendant was aware of the protected activity.

The third element of a retaliatory harassment claim may be satisfied by proof that

---

[5] The nature and character of the "hostile work environment" will be discussed in the retaliation discussion.

[6] As noted above, the plaintiff has decided not to pursue her failure to accommodate claim. Defendant alleged that plaintiff's failure to accommodate claim was improper because the plaintiff did not exhaust available remedies. Defendant seems to assert that because the failure to accommodate was improper, it cannot serve as the basis, or the protected activity, for her retaliation claim. This assertion is without merit in that the circuits have held that as long as the plaintiff made a good faith request for accommodation, her request was a protected activity, and the employer was prohibited from retaliating against her for requesting accommodation. *Coons v. Secretary of Treasury*, 383 F.3d 879, 886 (9thcir.2004); *Heisler v. Metropolitan Council*, 339 F.3d 622, 630 (8thCir.2003); *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 786 (3rdCir.1998).

14

plaintiff was subject to severe or pervasive retaliatory harassment by a supervisor. *Akers v. Alvey*, 338 F.3d 491, 497 (6th.Cir.2003). To establish "severe or pervasive" harassment, the plaintiff must show that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's environment." *Id.* at 498. The "severe or pervasive" test has both an objective and a subjective component. *Id.* The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive. *Id.*

The defendant asserts that the conduct of which plaintiff complains was not sufficiently severe or pervasive to constitute harassment under law. The Court must view the facts in the light most favorable to the plaintiff. A reasonable person could find the conduct alleged to be hostile or abusive, in a fair reading of plaintiff's testimony, affidavits, and evidence. Therefore, the Court declines to conclude as a matter of law that the conduct complained of was not objectively severe or pervasive.

Lastly, the parties dispute whether a casual connection existed between the protected activity and the adverse employment action or retaliatory harassment. The plaintiff is required to put forth some evidence to establish a causal connection between the retaliatory action and the protected activity, requiring the Court to draw reasonable inferences from that evidence, providing it is credible, and this burden is minimal. *Avery*, 104 F.3d at 861. The fact that the protected activity and adverse actions have close timing may suffice to satisfy the causal connection requirement. *Mallory v. Noble Correctional*

15

*Institute*, 45 Fed.Appx. 463, 473 (6thCir.2002). The "reason for inferring a casual connection from retaliation that occurs very shortly after a protected Title VII activity is that in such a short period of time little other than the protected activity could motivate the retaliation. Consequently, in those instances, it is safe to conclude that the sole cause of the adverse employment actions was the only aspect that changed - engaging in protected Title VII activities." *Id.*

In addition to the above analysis regarding temporal proximity, many of the acts constituting harassment were intimately related to the protected act of requesting accommodations: Ms. Brown's six month battle to receive a chair that was located adjacent to her office space; Ms. Brown's transfer to a department where she was forced to stand against her medical conditions; Ms. Brown's new workload that contained more tasking work duties; Ms. Brown's phone discussion with Mr. Swarts stating that he would "run her into the ground" and issue poor evaluations for her to receive disability retirement; etc. Further, when Ms. Brown filed a discrimination statement because she had not been accommodated, she was immediately subjected to additional harassment. These acts include: being accused as a dangerous person who would shoot a co-worker and blow up buildings; being barred and physically removed from her work building without knowledge of the reason; being accused of fraud when asking that her work compensation payments be paid after a delay; being issued a memo, which plaintiff believed was harassment, as well as an attempt to cover up the fact that management had not provided an accommodation in workload. Of course, the defendant disputes these facts and actions that would constitute harassment. Nonetheless, the facts are viewed in the light most

16

favorably to the plaintiff.  Therefore, the Court finds that the plaintiff has put forth sufficient evidence to sustain the causal connection element of retaliatory harassment.[7]

Since the plaintiff has established a *prima facie* case, the burden shifts to the defendant to offer legitimate, nondiscriminatory reasons for the acts complained about by the plaintiff.  The defendant offered reasons for their actions.[8]  However, in the light most favorable to the plaintiff, it is reasonable that the jury could reject the defendant's explanation and infer that the defendant did intentionally discriminate against the plaintiff, and the plaintiff has submitted evidence of such.  *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246-247 (6thCir.1997).  The Court is not prepared at this time to rule that the defendant had legitimate, nondiscriminatory reasons for actions taken.  Accordingly, summary judgment for the retaliation claim is not appropriate.

## **CONCLUSION**

For the reasons hereinabove set forth, defendant's motion for summary judgment [Doc. 27] is **GRANTED IN PART AND DENIED IN PART**; the motion is **GRANTED** as to Ms. Brown's claim that the IRS failed to accommodate her disabilities; and the motion is

---

[7] Furthermore, the Sixth Circuit has also ruled that the same circumstances, which established a causal connection between Ms. Brown's protected activity and the alleged retaliatory action, serve as sufficient evidence to meet the 3-part scheme.  *See Cantrell v. Nissan North America Inc.*, 145 Fed.App.99, 107-8 (6thCir.2005).

[8] For the most part, the defendant's legitimate, nondiscriminatory reasons center on simple mistake and/or misunderstanding.

17

**DENIED** as to Ms. Brown's claim of retaliation when she asked for reasonable accommodation. The parties will prepare the case for trial.

**IT IS SO ORDERED.**

                                              **ENTER:**

                                        S/Thomas W. Phillips
                                        United States District Judge